## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JAMES SCHERER, in his capacity as            )
Shareholders Representative,                  )
                                             )
                                             )     C.A. No. _____
            *Plaintiff,*                      )
                                             )
    vs.                                       )     JURY TRIAL DEMANDED
                                             )
THERMO FISHER SCIENTIFIC INC.,                )
                                             )
            *Defendant.*                      )
                                             )
                                             )
_____    )

## COMPLAINT

Plaintiff James Scherer ("Scherer"), in his capacity as the Shareholders Representative of

NovaWave Technologies, Inc. ("NovaWave"), for his Complaint against Defendant Thermo

Fisher Scientific Inc. ("Thermo Fisher"), hereby alleges as follows:

## INTRODUCTION

1.      This action arises out of Thermo Fisher's unlawful, fraudulent, and bad faith

scheme to deprive NovaWave's former shareholders of millions of dollars in earn-out payments

due under a merger agreement.  On January 28, 2010, Thermo Fisher, Notion Acquisition

Corporation (the "Merger Subsidiary"), NovaWave, certain "principal" shareholders of

NovaWave, and Scherer (as the Shareholders Representative) entered into the Agreement and

Plan of Merger ("Merger Agreement") pursuant to which NovaWave became a wholly owned

subsidiary of Thermo Fisher.  The Merger Agreement provided that, among other things,

NovaWave's shareholders were entitled to payments in an amount up to $4 million if NovaWave

hit certain revenue targets ("Revenue-Based Earn-Outs") between May 1, 2010 and April 30, 2012 (the "Earn-Out Period"), as well as earn-out payments in an amount up to $1 million if certain products were commercialized by specified dates ("Milestone Earn-Outs," and collectively with Revenue-Based Earn-Outs, "Earn-Outs").  NovaWave's shareholders agreed to this compensation structure because, among other reasons, Thermo Fisher agreed to do the following: (1) deliver "a reasonably detailed calculation of such revenue" to Scherer within sixty days of the end of each year; (2) to "use commercially reasonable efforts to support the sales and product development activities;" and, (3) to "immediately assist with assessment of the existing product designs and if required provide the necessary engineering support to attain ETL and CE product certifications."  NovaWave's shareholders would have achieved these significant Earn-Outs if Thermo Fisher had complied with its contractual obligations in good faith.

2.      But Thermo Fisher did not comply with its contractual obligations in good faith. Instead, Thermo Fisher repeatedly breached the Merger Agreement by, among other things, failing to provide any calculation of the revenue attributable to NovaWave, refusing to devote necessary resources to sales and product development (and certainly not commercially reasonable efforts), and disregarding Scherer's repeated requests for critically needed support for research and development, engineering, and documentation.

3.      And what is Thermo Fisher's claimed defense?  "The products never worked, the inventor never delivered."  Having invited NovaWave to a rigged gambling table, having cheated its rivals out of a fair bid for NovaWave, and without disclosing to Scherer and NovaWave's former shareholders the actual, internal rules of the game that made the Earn-Outs impossible to achieve—Thermo Fisher now blames the inventor for losing a rigged game.

4.      In a nut shell, Thermo Fisher's fraudulent business decisions and blatant incompetence made it effectively impossible for NovaWave to reach revenue and milestone targets necessary to qualify for the Earn-Outs.  For example, Thermo Fisher put NovaWave on a shoestring budget that was never disclosed explicitly to Scherer, the default on-site manager in lieu of an absent integration lead, systematically reduced its staff 30% during the Earn-Out Period, discontinued pre-existing sales channels, including halting email campaigns and terminating NovaWave's sales staff, refused to pursue additional sales and marketing opportunities, and actively prevented the marketing of pre-existing products or the commercialization of products in development.

5.      As a result of its unlawful scheme, Thermo Fisher has failed to pay NovaWave's former shareholders the Earn-Outs to which they are rightfully entitled.

<u>**PARTIES**</u>

6.      Scherer is an individual residing in the State of California.  Scherer is the President and Chief Executive Officer of NovaWave.  Pursuant to Section 10.7 of the Merger Agreement, Scherer was appointed as the Shareholders Representative by a vote of NovaWave's shareholders.  As the Shareholders Representative, Scherer is authorized to, among other things, "agree to, negotiate, enter into settlements and compromises of, and demand arbitration and comply with orders of courts and awards of arbitrators with respect to such claims," as well as "to take or refrain from taking all other action, and execute and deliver all additional agreements, documents, certificates and instruments, as the Shareholders Representative may deem necessary or appropriate in connection with the transactions contemplated by this Agreement."

7.      Thermo Fisher is a corporation organized and existing under the laws of Delaware with its principal place of business at 81 Wyman Street, Waltham, Massachusetts 02451.

According to its most recent quarterly report on Form 10-Q filed with the Securities and
Exchange Commission on May 3, 2013, Thermo Fisher provides "analytical instruments,
equipment, reagents and consumables, software and services for research, manufacturing,
analysis, discovery and diagnostics" to various markets, including "pharmaceutical and biotech
companies, hospitals and clinical diagnostic labs, universities, research institutions and
government agencies, as well as environmental and industrial process control settings." Thermo
Fisher trades on the New York Stock Exchange under the symbol "TMO."

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because
the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs,
and is between citizens of different states.

9.      This Court has personal jurisdiction over Thermo Fisher because Thermo Fisher
is incorporated in, and thus a citizen of, Delaware.

10.     Venue is proper in this Court pursuant to Section 12.8 of the Merger Agreement,
whereby Thermo Fisher and Scherer agreed to "irrevocably submit[] to the exclusive jurisdiction
and venue of the Delaware state and federal courts for the purpose of any action, claim, cause of
action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or
related to this [Merger] Agreement."

## FACTUAL BACKGROUND

### A.      Thermo Fisher Makes a Series of Misrepresentations to Induce NovaWave to Execute the Merger Agreement.

11.     Prior to entering into a "no-shop" arrangement with Thermo Fisher, NovaWave
had significant discussions regarding a potential merger or other licensing arrangements with

several other companies.  In addition, in late-2009, a venture capital firm expressed interest in

investing in and expanding NovaWave's business.  In short, Thermo Fisher was not Scherer's

and NovaWave's only option.  And Thermo Fisher knew this.

12.     In December 2009 and January 2010, during negotiations on the Merger

Agreement, Thermo Fisher employees, including Michael Nemergut (then the General Manager

for the Air Quality Instruments division) and Dieter Kita (then the Director of Research and

Development for the Air Quality Instruments division), made a series of misrepresentations in

order to induce Scherer and NovaWave's former shareholders to merge with Thermo Fisher

rather than a third party.  After entering into the Merger Agreement, however, Scherer

discovered that Nemergut consistently over-promised and under-delivered, often making

assurances and subsequently reneging on commitments.  Similarly, after entering into the Merger

Agreement, Scherer discovered that Kita was out-of-touch with the reality on the ground, had no

knowledge on any of the details, and was completely delusional about the competency of his

employees.

13.     For example, in December 2009 and January 2010, Thermo Fisher employees

repeatedly represented to NovaWave that it intended to hire additional employees in order to

assist with, among other things, necessary research and development, sales, and product

development.  Thermo Fisher knew that its representation that it would hire additional employees

was important to Scherer and NovaWave's former shareholders because many of NovaWave's

products were still in development, and thus needed additional efforts and resources in order to

bring them to market and achieve substantial sales.  But Thermo Fisher's representation was

false.  Thermo Fisher never intended to hire additional employees and, in fact, reduced

headcount by 30% during the Earn-Out Period.

14.     In addition, in December 2009 and January 2010, Thermo Fisher repeatedly represented that it would support NovaWave's sales and product development efforts with "commercially reasonable efforts"—a term that Scherer now knows to be meaningless to Thermo Fisher.  Similarly to the increase in headcount, Thermo Fisher knew that its representation was important to Scherer and NovaWave's former shareholders because such support would be necessary for NovaWave's products to make it to, and ultimately succeed in, the marketplace.  As described in detail below, however, Thermo Fisher's representation was false.  Rather than support NovaWave's sales and product development efforts, Thermo Fisher instead undermined such efforts and wholly failed to respond to Scherer's complaints or criticism regarding the lack of any such support.

15.     Further, in December 2009 and January 2010, Thermo Fisher employees repeatedly represented that the targets for the Earn-Outs were reasonable and achievable.  But this representation was false.  Thermo Fisher knew that its formal and painfully slow "Stage Gate" process for launching new products would make it impossible to attain the targets.  Importantly, however, Thermo Fisher failed to disclose the "Stage Gate" process during the merger negotiations despite the fact that its existence had a material effect on NovaWave's business and revenue.  In fact, only months after the execution of the Merger Agreement, Thermo Fisher employees, including Mike Corvese (then the Vice President for Global Sales and Marketing) and Kita, informed Scherer and other third parties that the milestones were impossible to achieve with NovaWave's technology because, among other things, the products had to pass through the "Stage Gate" process.  During the merger negotiations, Thermo Fisher's employees, including Corvese and Kita, knew that the "Stage Gate" process would make it impossible for NovaWave to achieve the Earn-Outs.  Thermo Fisher's failure to disclose this

fact, and its repeated representations that the Earn-Outs were achievable, were thus intentionally misleading.  As further context, Corvese explained to a third party that the milestones in the Merger Agreement were similar to milestones that Thermo Fisher would issue in acquisitions of larger companies with existing product lines and a history of commercial sales.

16.     NovaWave reasonably relied upon all of these fraudulent misrepresentations, and on January 28, 2010, Thermo Fisher and NovaWave, as well as the Merger Subsidiary, certain "principal" shareholders of NovaWave, and Scherer (as the Shareholders Representative), entered into the Merger Agreement.  Pursuant to the Merger Agreement, NovaWave became a wholly owned subsidiary of Thermo Fisher in exchange for a base payment to NovaWave's former shareholders of $21 million, subject to certain adjustments (including the potential for Earn-Outs).

### B.     Thermo Fisher Agreed to Pay Revenue-Based Earn-Outs.

17.     Thermo Fisher agreed to make payments for Revenue-Based Earn-Outs to Scherer (for further distribution to NovaWave's former shareholders) of up to $4.0 million if NovaWave hit certain revenue targets during the Earn-Out Period.  Specifically:

    a.     Year One (May 1, 2010 to April 30, 2011):  Thermo Fisher agreed to pay $2.0 million to Scherer (for further distribution to NovaWave's former shareholders) if NovaWave's total revenues in Year One (May 1, 2010 to April 30, 2011) exceeded $5.0 million.  If NovaWave's total revenues in Year One were between $4.25 million and $5.0 million, however, Thermo Fisher agreed to pay the $2.0 million earn-out "on a *pro rata* basis relative to the percentage of the $0.75 million shortfall achieved."  For example, if NovaWave's revenue was $4.625 million, then Thermo Fisher would pay $1.0 million.  And if NovaWave's total

revenues in Year One were less than $4.25 million, Thermo Fisher would not make any payments for Revenue-Based Earn-Outs for this time period.

b. <u>Year Two (May 1, 2011 to April 30, 2012)</u>: Thermo Fisher agreed to pay $2.0 million to Scherer (for further distribution to NovaWave's former shareholders) if NovaWave's total revenues in Year Two (May 1, 2011 to April 30, 2012) exceeded $12.0 million. If NovaWave's total revenues in Year Two were between $10.5 million and $12.0 million, however, Thermo Fisher agreed to pay the $2.0 million earn-out "on a *pro rata* basis relative to the percentage of the $1.5 million shortfall achieved." For example, if NovaWave's revenue was $11.25 million, then Thermo Fisher would pay $1.0 million. And if NovaWave's total revenues in Year Two were less than $10.5 million, Thermo Fisher would not make any payments for Revenue-Based Earn-Outs for this time period.

c. <u>Catch-Up Provision</u>: Thermo Fisher also agreed to make a "catch-up" payment to Scherer (for further distribution to NovaWave's former shareholders) in the event that NovaWave's total revenues did not exceed $5.0 million in Year One, but NovaWave's total revenues exceeded $12.0 million in Year Two. Specifically, Thermo Fisher agreed that any revenue in excess of $12.0 million in Year Two would be added to revenue in Year One for purposes of a "revenue carryback calculation," and that Thermo Fisher would then pay 50% of any earn-out payment resulting from the recalculation of revenue in Year One. For example, if NovaWave's revenues were $3.0 million in Year One and $15.0 million in Year Two, Thermo Fisher agreed to make a $1.0 million "catch-up" payment to

Scherer for Year One in addition to the $2.0 million earn-out payment for Year Two.

18.     Thermo Fisher agreed to pay all Revenue-Based Earn-Outs to Scherer within 10 business days of the date on which total revenues are determined pursuant to Section 3.11(e)(vi) of the Merger Agreement.

**C.      Thermo Fisher Agreed to Pay Certain Milestone Earn-Outs.**

19.     Thermo Fisher also agreed to make payments for Milestone Earn-Outs to Scherer (for further distribution to NovaWave's former shareholders) of up to $1.0 million if NovaWave hit certain milestones.  Specifically, Thermo Fisher agreed to pay $0.2 million for each of the following products if they were commercialized by their respective dates:

   a.   Methane/H20 Analyzer—July 1, 2010;

   b.   CO Analyzer—October 2, 2010;

   c.   N20 Analyzer—December 1, 2010;

   d.   CO2 Analyzer—February 1, 2011; and,

   e.   H20 Isotope Ratio Instrument—July 1, 2011.

20.     For purposes of the Milestone Earn-Outs, the parties agreed that "commercialization" means "the time that the respective product is ready for commercial sale with full documentation completed including a functional pre-production prototype, and the associated Bill of Materials, Assembly and Test Procedures and Instruction Manual."

21.     Thermo Fisher agreed to pay all Milestone Earn-Outs to Scherer within 10 business days of the date on which such Milestone Earn-Outs are earned pursuant to Section 3.11(d) of the Merger Agreement.

22.     Although Thermo Fisher has made certain payments for Milestone Earn-Outs, Thermo Fisher failed to make any of these payments "within 10 business days."  In fact, after repeated requests from Scherer, Thermo Fisher made one payment *six* months late.

**D.     Thermo Fisher Agreed to Terms Designed to Protect and Enable the Achievement of the Earn-Outs.**

23.     As an initial matter, Scherer and NovaWave's former shareholders would not have entered into the Merger Agreement without the provisions for Earn-Outs.  In order to protect the likelihood of receiving the Earn-Outs, therefore, they required the inclusion of terms in the Merger Agreement that were designed to minimize the likelihood that Thermo Fisher would structure its business in a manner that would undermine the likelihood of such Earn-Outs.

24.     First, the parties agreed to terms governing the calculation of revenue for purposes of calculating the Revenue-Based Earn-Outs.  Pursuant to Section 3.11(e)(vi) of the Merger Agreement, Thermo Fisher agreed to "calculate revenue of [NovaWave], for purposes of this Section 3.11, and [to] deliver to [Scherer] a reasonably detailed calculation of such revenue of [NovaWave] within 60 days after the end of each of Year One and Year Two."  If Scherer, as the Shareholders Representative, objected to Thermo Fisher's revenue calculations, Scherer was contractually entitled to deliver an "Earn Out Dispute Notice" to Thermo Fisher within thirty days of receipt of the revenue calculations, and if necessary, to submit the disagreement to a "Neutral Auditor" for an independent calculation that would be final and binding on the parties.

25.     In order to minimize the potential for disagreements regarding the method of revenue recognition, the parties also agreed in Section 3.11(e)(i) of the Merger Agreement that "[r]evenues would be recorded on a U.S. GAAP basis less any bad debts as determined on a basis consistent with past practice and excluding the effects of any purchase accounting resulting

from this transaction." And Section 3.11(e)(ii) of the Merger Agreement further clarified that NovaWave's "performance shall include the benefits of any synergies realized during Year One and Year Two which directly relate to [NovaWave's numerous technologies under development, as well as existing products,] and [NovaWave] shall, for purposes of calculating revenues for purposes of this Section 3.11, receive credit for products developed in whole or in part by [NovaWave] and sold or licensed by [Thermo Fisher] or any of its affiliates or successors."

26.    Second, Thermo Fisher agreed to use "commercially reasonable efforts to support the sales and product development activities" of NovaWave during the Earn-Out Period.

27.    Third, in connection with the commercialization of new products, Thermo Fisher agreed that its research and development personnel would "immediately assist with assessment of the existing product designs and if required provide the necessary engineering support to attain ETL and CE product certifications." Thermo Fisher also agreed that it would provide "comparable support" for the "preparation of supporting product documentation"—including user's manuals, electrical and mechanical manufacturing and assembly drawings, assembly procedures, and other engineering documentation.

### E.    Thermo Fisher Failed to Comply with Its Contractual Obligations.

i.    Thermo Fisher Failed to Provide the Revenue Calculations.

28.    As described in detail above, pursuant to Section 3.11(e)(vi) of the Merger Agreement, Thermo Fisher was required to deliver to Scherer "a reasonably detailed calculation" of revenue attributable to NovaWave "within 60 days after the end of each of Year One and Year Two."

29.     Thermo Fisher failed to comply with its contractual obligations because it did not deliver "a reasonably detailed calculation of such revenue" to Scherer within 60 days after the end of Year One.

30.     Scherer, as the Shareholders Representative, requested that Thermo Fisher provide him with "a reasonably detailed calculation of such revenue" for Year One.

31.     But despite Scherer's request, Thermo Fisher *never* provided "a reasonably detailed calculation of such revenue" for Year One to Scherer.

32.     Without the detailed calculation of revenue attributable to NovaWave in Year One, Scherer was unable to determine whether he and other former shareholders were entitled to Revenue-Based Earn-Outs for Year One, or what revenue would be necessary during Year Two in order to achieve the targets for Earn-Outs in the "catch-up provision."

33.     Similarly, in the absence of *any* calculation of revenue, Scherer was unable to object to Thermo Fisher's calculation of revenue attributable to NovaWave in Year One by delivering an "Earn Out Dispute Notice," or to submit any dispute to a "Neutral Auditor" for an independent calculation.

34.     Thermo Fisher also failed to comply with its contractual obligations because it did not deliver "a reasonably detailed calculation of such revenue" to Scherer within 60 days after the end of Year Two.

35.     Scherer, as the Shareholders Representative, requested that Thermo Fisher provide him with "a reasonably detailed calculation of such revenue" for Year Two.

36.     Despite Scherer's request, Thermo Fisher *never* provided "a reasonably detailed calculation of such revenue" for Year Two to Scherer.

37.     Without the detailed calculation of revenue attributable to NovaWave in Year Two, Scherer was unable to determine whether he and other former shareholders were entitled to Revenue-Based Earn-Outs for Year Two.

38.     Similarly, in the absence of *any* calculation of revenue, Scherer was unable to object to Thermo Fisher's calculation of revenue attributable to NovaWave in Year Two by delivering an "Earn Out Dispute Notice," or to submit any dispute to a "Neutral Auditor" for an independent calculation.

39.     Thermo Fisher's utter failure to comply with its explicit contractual obligations to provide revenue calculations is exemplary of its complete disregard for NovaWave's former shareholders.

ii.     Thermo Fisher Failed to Use Commercially Reasonable Efforts.

40.     As described in detail above, pursuant to Section 3.11(e)(v) of the Merger Agreement, Thermo Fisher was required to "use commercially reasonable efforts to support the sales and product development activities" of NovaWave during the Earn-Out Period.

41.     Thermo Fisher failed to comply with its contractual obligations because its woefully inadequate support for ongoing research and product development, manufacturing engineering support, sales and marketing does not constitute "commercially reasonable efforts"—a term that Scherer now knows is meaningless to Thermo Fisher and its employees.

a.     *Inadequate Resources for Sales and Product Development.*

42.     Thermo Fisher refused to commit the resources necessary to ensure successful sales and product development for NovaWave's existing or pending products.  Instead, Thermo Fisher's performance was in keeping with the reputation of Michael Nemergut, the Thermo

Fisher employee initially tasked with overseeing NovaWave's products post-merger who has tellingly been demoted twice since the end of Year Two—"over promise and under deliver."

43.     Thermo Fisher did not actively market or advertise NovaWave's existing products, or in any other way incorporate such products into its significant sales channels (except to update a few product sheets). Indeed, Thermo Fisher completely abandoned two of NovaWave's pre-existing technologies after the merger—radiation detection and "whispering gallery Biosensor."

44.     Thermo Fisher also scaled back NovaWave's presence at tradeshows significantly—downsizing from a typical hundred square foot booth to three to four feet of table space.

45.     In addition, although there was no advertising budget for magazines and journals, Thermo Fisher halted all email marketing for an extended period of time during the Earn-Out Period despite the fact that this was NovaWave's main marketing channel comprised of 60,000 hand-assembled and legitimate target customers built over an eight year period immediately prior to the merger.

46.     Additionally, Thermo Fisher failed to provide necessary IT support to maintain and assure website functionality in a timely manner.

47.     And Thermo Fisher made no effort to pursue additional product development for numerous promising technologies previously demonstrated by NovaWave, including a Radiation Detection (Gamma Ray Spectrometer) technology that had been exclusively licensed from Lawrence Livermore National Labs that had been developed and demonstrated by NovaWave in several field trials with extremely promising results. In an email dated April 12, 2010, just months after the merger, Scherer communicated his concern about not pursuing the Radiation

Detector technology to Nemergut, explicitly noting that it would negatively impact NovaWave's potential revenues from product development "if [Thermo Fisher] passes on it."

48.     Moreover, only a few months post-merger, Thermo Fisher altogether halted development of straightforward applications for the core sensor technology upon which the greenhouse gas sensor was based for two other major business units within Thermo Fisher, the Isotope Ratio and Process Systems groups.  Thermo Fisher thus shut down all development for such commercialization channels despite the fact that Scherer and other NovaWave employees spent considerable time with the Process Systems group during merger negotiations, and had identified clear and immediate opportunities for the technology in relevant markets.

49.     In sum, in contrast to assurances during merger negotiations that Thermo Fisher would pursue all applications of the sensor technologies (including twelve new employees to pursue these applications), Thermo Fisher instead put all such activities on hold during the Earn-Out Period.   Thermo Fisher took such actions over Scherer's objections that this approach would limit NovaWave's access to large markets that would significantly contribute to revenues and thus enable the achievement of Revenue-Based Earn-Outs.

50.     Moreover, Thermo Fisher's "support" from existing sales, marketing, and manufacturing resources was minimal and half-baked for actual released gas sensor products (Methane, CO, and N2O Analyzers) after their release, thus precluding the ability to achieve the significant sales and marketing necessary to hit the revenue targets for the Revenue-Based Earn-Outs.

b.      *Thermo Fisher Botched the Post-Merger Integration.*

51.     Thermo Fisher completely botched the post-merger integration of NovaWave into its business.  For example, despite oral commitments to the contrary, Thermo Fisher never hired

or appointed an on-site employee as the "acquisition integration lead." As a result, Scherer, the CEO of NovaWave, was required to spend the majority of his time meeting with various departments (IP, IT, HR, Contracts, Legal, etc.) regarding the merger, and thus could not dedicate his time to management of the NovaWave team and marketing and sales as he had done previously. In an email dated April 21, 2010, a few months post-merger, Scherer clearly stated that the team was already "minus 1" in head count and that he was spending an inordinate amount of time on integration activities, having spent "4 out of 5 days solid last week [fielding] integration meetings."

52.     On several occasions, Nemergut instructed Scherer to assure his team that Thermo Fisher would hire additional employees. But after Scherer spent considerable time and effort to interview and line up new hires, Nemergut canceled the new hire positions last minute, thereby reducing resources, undermining Scherer's credibility, and reducing the staff's morale.

53.     Similarly, although Thermo Fisher expected Scherer to continue to manage the office, Thermo Fisher failed to make it clear to the team that he was to continue in this role (despite Nemergut's repeated assurances that he would do so), thereby significantly compromising his ability to manage the team successfully and generate revenue post-merger.

54.     Additionally, Thermo Fisher ignored Scherer's repeated requests for an operating budget, and somehow expected Scherer to work with nebulous, reduced resources and no associated reduction in milestone deliverables.

55.     Nemergut's failure to communicate Scherer's role as the "site manager" led to numerous instances of employee clashes, lack of cooperation and insubordination from on-site employees in finance and other departments, thereby wasting precious time and causing unnecessary distractions from the task of making the Earn-Outs. On January 19, 2011, after

struggling in his capacity as site manager during Year One, Scherer requested Nemergut to help

him manage the site in the now-complete absence of an integration lead: "From my standpoint, I

seem to be responsible for everything I was as CEO of NovaWave, which is OK as long as it is

clear and I am given the authority and transparency to know what is going on at all relevant

levels.  I understand that integration is a challenging and non-linear process, and that many of the

responsibilities related to this have landed in my lap as an integration manager was not hired, and

Hossein (yet another off-site person appointed as Integration Lead) has been essentially

incommunicado the last 6 months. . . . Now I just want a clear picture of the process moving

forward and what I can expect from this job."  Nemergut wholly failed to address this clear

chasm in management with respect to the integration.

56.     Nemergut's failure to support Scherer thus significantly compromised the morale

of the team, and undermined Scherer's ability to retain key staff.  In addition, Thermo Fisher

failed to replace key staff members who resigned, thereby systematically resulting in key staff

reductions during the Earn-Out Period.  For example, Vartan Ter-Mikirtychev, NovaWave's

principle laser scientist, and Paul Ishkanian, a Lead Mechanical Engineer, both quit due to their

complete lack of faith in, or perceived credibility of, Thermo Fisher's management.  And after

Messrs. Ter-Mikirtychev and Ishkanian resigned, Thermo Fisher never replaced them with new

permanent employees.

57.     Thermo Fisher's complete lack of care in providing a clear chain of command and

the failure to appoint a responsible integration lead wasted valuable time and resources, and

Thermo Fisher's refusal to make new hires as promised or replace existing staff that quit resulted

in staff reductions that made the Earn-Outs impossible to achieve.  On May 28, 2010

(approximately three months after the merger), Scherer informed Nemergut that "Franklin [a

Thermo Fisher office in Massachusetts] has simply not provided enough support [for] this entire project," "[NovaWave] have asked for help with mechanical drawing/drafts [i.e. an additional mechanical engineer in Redwood City or Franklin] from day 1 and have gotten essentially nothing," and "we were told we would have technical writers and we have received absolutely no support." Indeed, Nemergut later informed Scherer that Thermo Fisher "had no technical writers," "never had technical writers," and that usually the "product line manager or manager usually ends up writing the users manuals." Indeed, Scherer ended up spending considerable time writing the first draft of the methane sensor product (Model IRIS 5500) users manual (30 pages plus), before handing the task off to Dr. Steven Holler, one of his few Ph. D. scientists, for completion. Moreover, in this same email, Scherer represented that "we want to succeed in meeting our milestones, and frankly I don't see Franklin with helping in any significant way in that regard."

58.     Thermo Fisher took no significant or appropriate action to remedy the situation in response to Scherer's repeated requests for support. Quite the contrary—the situation only worsened with time.

c.     *Thermo Fisher Downsized NovaWave's Staff.*

59.     In direct contradiction of Thermo Fisher's oral promises (as repeatedly assured by Nemergut and other management) during negotiations on the Merger Agreement that it would increase the staff dedicated to NovaWave products by 12 employees (specifically 6 on-site in Redwood City, CA, and 3 each off-site in Franklin, MA and Bremen, Germany), Thermo Fisher instead continuously reduced NovaWave's staff from 18 employees at the time of the Merger Agreement to 13 employees at the end of the Earn-Out Period (a 28% reduction) and 11

employees (a 39% reduction) before finally shutting down the site in Redwood City entirely and firing nearly all of the employees.

60.     On April 20, 2010, Scherer sent an email to Corvese, VP of Sales and Marketing at Thermo Fisher who was the first in a series of "off-site" integration leads, in which Scherer raised the lack of research and development support and the associated negative impact on achieving the Revenue-Based Earn-Outs: "I am also wondering when we will have an interface with Dieter's (R&D Director, AQI) folks," and "we talked about what it would take to hit all of these milestones on time, and that included around 10-12 new people, 5-6 here and 5-6 at Franklin. I have one additional software contractor since the merger and one less employee. Realistically, I can't get all of this stuff done by everyone else's schedule without additional support. . . . [T]he pre-merger indications of support are not being realized." Thermo Fisher summarily dismissed Scherer's repeated "cries for help" to Corvese, Nemergut, and Kita.

61.     As a result of these staff reductions, including the termination of the only salesman and administrative assistant in Redwood City over Scherer's strong objections, NovaWave was not able to devote the resources required to finish products as scheduled.

       iii.     Thermo Fisher Failed to Provide the Necessary R&D Resources.

62.     As described in detail above, pursuant to Section 3.11(e)(iv) of the Merger Agreement, Thermo Fisher was required to provide research and development personnel who would be able to "immediately assist with assessment of the existing product designs and if required provide necessary engineering support to attain ETL and CE product certifications." Further, Thermo Fisher was also required to provide "comparable support" in connection with the "preparation of supporting product documentation."

63.    During pre-merger negotiations, Thermo Fisher was acutely aware that the gas analyzers developed by NovaWave were pre-market prototypes and required significant additional repackaging and development in order to reach market.  This additional work included, among other things, adding a thermal chamber to stabilize the key optical "engine" of the analyzer, and significant software refinement to enable autonomous operation and calibration in the field.

64.    Thermo Fisher utterly failed to comply with its contractual obligations to provide the necessary support for engineering and research and development for several reasons.

a.    *Thermo Fisher Failed to Provide Necessary Support.*

65.    Thermo Fisher failed to provide adequate engineering or research and development to assist with finishing the product development, repeatedly stating that Thermo Fisher "did not have a resource for that," meaning that staff in Franklin was not even available to assist in any meaningful way in the efforts.  And in cases where Thermo Fisher provided some support, the performance was substandard and the commitment and accountability was wholly inadequate.

66.    For example, besides interfacing at a cursory level with the NovaWave staff immediately after the merger, AQI's R&D Director, Dieter Kita, was wholly unseen in Redwood City for the first several months, and no significant mechanical or electrical engineering or R&D resources were committed to assisting in refining the product for release.

67.    Countless meetings were held wherein requests for specific resources such as a mechanical engineer to simply transcribe NovaWave's solid models to manufacturing drawings were denied due to "not having a resource available."

68.     Although Thermo Fisher eventually provided assistance for CE testing, these efforts were marginal at best with no "ownership" of any significant subsystem associated with the analyzer outside of a relatively trivial "power entry module," which was an existing subcomponent from other legacy products.

69.     Thermo Fisher's failure to provide the necessary resources was one of the largest factors contributing to delays in finishing the commercialization and subsequent sales of new NovaWave products.  As described above, Scherer complained repeatedly about Thermo Fisher's failure to provide necessary research and development resources.  But Thermo Fisher's only response was to schedule meetings to which Thermo Fisher employees would arrive unprepared and leave without any action items.

70.     For example, in an email to Corvese on June 15, 2010, Scherer discusses the delivery of poorly constructed and untested cable assemblies that Franklin (AQI) was responsible for producing for the first methane analyzer pre-production prototypes, which after being installed damaged several key laser components in the prototypes, causing the NovaWave group to "have to rebuild more than half of what was sent" due to "novice level cabling errors." Further, in the same email, Scherer noted that "there are several lengthy emails that I sent that were not responded to, including issues of resources, bonus distributions for closing balance sheet issues, and build/deliverable issues, etc.  On top of the recent sheet metal problems (parts were not ordered by Franklin, forcing us to rework old cases), this problem with the cables has pushed me to informing both you and Mike N.[Nemergut] on all correspondence. . . . We may not hit our Milestone as a result of these problems."  And Scherer further added that "our general feeling here is that we are not being supported at the level that was indicated from the beginning and that is why I raise the ownership issue (wrt sending us defective and moreover, untested

cables." Finally, Scherer noted that "[w]hen we embarked on this effort, we were told we would receive significant support. We have not in my opinion." Indeed, on information and belief, deposition testimony from other former NovaWave employees, as well as Thermo Fisher employees in different business units, including Johannes Schweiters (Director for the Isotope Ratio Mass Spectroscopy "IRMS" Group in Bremen, Germany) and his engineers and scientists, and Andreas Hilkert (a marketing and sales manager in Bremen, Germany), would corroborate the lack of competence, ownership and follow-through on the part of Thermo Fisher employees in Franklin in assisting with critical instrument platform development and manufacturing. Indeed, the IRMS group sought permission from upper management and was granted same to embark on their own commercialization efforts for the technology, wholly independent from the team in Franklin, after it became clear to them that Franklin's dysfunctional and uncommitted team would not succeed with commercialization of the technology, in spite of repeated demonstrations in the field and laboratory that the technology "works as promised." The IRMS group's commercialization and development efforts continue with success to this date.

> b.   *Thermo Fisher's "Stage Gate" Process Hindered Development.*

71.   Thermo Fisher applied a formal and painfully slow "Stage Gate" process for launching new products that Thermo Fisher failed to disclose during the merger negotiations. This "Stage Gate" process involved an enormous amount of red tape that greatly slowed down the commercialization of new products, thereby decreasing the odds that NovaWave would hit the necessary milestones for the Revenue-Based Earn-Outs and the Milestone Earn-Outs. Further, NovaWave was effectively aiming at a moving target because Thermo Fisher constantly revised the necessary requirements, including the number of prototypes, test conditions, and performance specs, in the "Stage Gate" process, thereby making the final stage in the

commercialization of products more difficult to obtain.  And, further exacerbating the delays, Thermo Fisher failed to provide significant support for, among other things, the following: engineering documentation "releases" to thermo standards, manufacturing documentation, service training, and user's manual drafting.

72.     Any claim by Thermo Fisher as to the purported ineffectiveness of NovaWave's products is belied by the success of such products in Thermo Fisher's rigorous "Stage Gate" process.  If Thermo Fisher's claim were true, then surely the products would not have passed Thermo Fisher's own vetting process.  Indeed, upon information and belief, several current and former employees of Thermo Fisher would testify at deposition and trial that thousands of hours of beta and lab test results confirm that NovaWave's products work at spec.

c.     *Thermo Fisher Hired an Incompetent "Primary Technical Lead."*

73.     Thermo Fisher appointed Andrew Wright, an incompetent employee, as the so-called "primary technical lead" for NovaWave's products, and then ignored repeated requests by Scherer and other Ph. D. lead scientists at NovaWave to replace him.  Thermo Fisher's refusal to replace Wright with a competent employee who is able to understand, properly test and troubleshoot, and transfer the technology such that NovaWave would not be forced to manufacture all of the systems post-release resulted in significant delays in the launch of products, and undermined Franklin's (AQI's) ability to fulfill orders subsequently placed by customers. Having fired all of the NovaWave staff who manufactured the instrument "cores" before having successfully transferred that capability to either Franklin (via Dr. Wright) or a viable third-party vendor (Jabil, Inc.), the Franklin team is presently unable to fill customer orders, leading to cancelled orders and no-bid situations from the sales staff, who presently have no confidence in the Franklin team's ability to manufacture or support the technology.

74.     In numerous cases, Wright demonstrated a clear lack of understanding of very basic skills known to anyone trained in the field of laser-based gas analyzers or laser spectroscopy.  For example, shortly after his hire, Wright expressed to former scientists at NovaWave that he needed to "drill down on Beer's law," which is a very basic freshman-level college equation that relates the strength of an absorbing sample as a function of the intrinsic absorption "line strength" and optical path length.  Similarly, Wright was clearly unable to grasp the concept of "dry mole fraction" even after repeated discussions. Indeed, embarrassingly, Wright even asked a customer to explain "dry mole fraction."

75.     Similarly, in repeated instances, Wright was unable to find simple vacuum leaks in analyzers, could not troubleshoot relatively simple problems, and was not able to build the very basic optical assembly after repeated training by NovaWave's staff.  In fact, technicians without college degrees were able to master this task after only two sessions, but Wright could not do so after six sessions.  Further, Wright was clearly ignorant on several simple concepts, such as fitting routines, calibration of instruments and many other entry-level technical skills. Upon information and belief, deposition testimony from current and former employees of Thermo Fisher would confirm Wright's incompetence to serve as the Technical Lead. Nevertheless, despite Scherer's repeated requests that Thermo Fisher assign Wright to another product or terminate his employment, Thermo Fisher instead expanded Wright's responsibilities to include overseeing new product development that he was simply incapable of handling.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

76.     Scherer realleges and incorporates by reference each and every allegation contained in the above paragraphs as if set forth fully herein.

77.     On January 28, 2010, Thermo Fisher entered into the Merger Agreement with Scherer (as the Shareholders Representative), NovaWave, certain "principal" shareholders of NovaWave, and the Merger Subsidiary.

78.     As described in detail above, Thermo Fisher breached the Merger Agreement by, among other things, failing to provide any calculation of the revenue attributable to NovaWave, refusing to devote "commercially reasonable efforts" to promote sales and product development, and disregarding Scherer's requests for assistance with research and development.

79.     Scherer and other former shareholders of NovaWave have fully performed their promises and obligations under the Merger Agreement.

80.     As a direct and proximate result of Thermo Fisher's breach of contract, Scherer has incurred general and special damages in an amount to be determined according to proof at trial.

## SECOND CLAIM FOR RELIEF

### (Fraud)

81.     Scherer realleges and incorporates by reference each and every allegation contained in the above paragraphs as if set forth fully herein.

82.     As discussed in detail above, in December 2009 and January 2010, during negotiations on the Merger Agreement, Thermo Fisher, through its employees and agents, made a series of false misrepresentations to Scherer and NovaWave's former shareholders.  For example, Thermo Fisher repeatedly misrepresented that the targets for the Earn-Outs were reasonable and achievable.  As further context, Corvese explained to a third party that the milestones in the Merger Agreement were similar to milestones that Thermo Fisher would issue in acquisitions of larger companies with existing product lines and a history of commercial sales.

83.     Thermo Fisher knew or believed that these representations were false at the time in which Thermo Fisher made them; or, in the alternative, Thermo Fisher made the false representations with a reckless indifference to the truth.  For example, as its employees admitted only months after the execution of the Merger Agreement, Thermo Fisher knew during the merger negotiations that its formal and painfully slow "Stage Gate" process for launching new products would make it impossible to attain the Earn-Outs.

84.     Thermo Fisher made these false representations with the intent to induce Scherer and NovaWave's former shareholders to enter into the Merger Agreement.  For example, Thermo Fisher failed to disclose the "Stage Gate" process during the merger negotiations despite the fact that its existence had a material effect on NovaWave's business and revenue because such a revelation would have alerted Scherer and NovaWave's former shareholders that the Earn-Outs were not, in fact, achievable.  Importantly, during negotiations on the Merger Agreement, Thermo Fisher knew that NovaWave was also in negotiations with various third parties, including its foreign competitor, and thus Thermo Fisher made false representations in order to ensure that NovaWave did not enter into an agreement with a third party.

85.     Scherer and NovaWave's former shareholders justifiably relied upon Thermo Fisher's false representations.  If Scherer and NovaWave knew that Thermo Fisher intended to conduct its business in a manner that would make the Earn-Outs impossible to achieve, Scherer and NovaWave's former shareholders would never have agreed to enter into the Merger Agreement.

86.     Scherer and NovaWave's former shareholders were injured by their reliance on Thermo Fisher's false representations in an amount of at least $4 million.  If they knew that the information provided by Thermo Fisher was false, Scherer and the former shareholders of

NovaWave would not have agreed to structure the Merger Agreement with significant consideration in the form of Earn-Outs.

## THIRD CLAIM FOR RELIEF

### (Negligent Misrepresentation)

87.    Scherer realleges and incorporates by reference each and every allegation contained in the above paragraphs as if set forth fully herein.

88.    Thermo Fisher owed a pecuniary duty to provide accurate information to Scherer and other former shareholders of NovaWave based on the pecuniary benefits of the Earn-Outs that Scherer and other former shareholders of NovaWave expected to receive from Thermo Fisher pursuant to the Merger Agreement.

89.    As described in detail above, during the pre-merger negotiations, Thermo Fisher supplied false information to Scherer and other former shareholders of NovaWave in order to induce them to enter into the Merger Agreement.

90.    Thermo Fisher failed to exercise reasonable care in obtaining or communicating this false information to Scherer and other former shareholders of NovaWave during the pre-merger negotiations.

91.    Scherer and other former shareholders of NovaWave suffered a pecuniary loss in an amount of at least $4 million caused by their reliance upon the false information provided by Thermo Fisher.  If they knew that the information provided by Thermo Fisher was false, Scherer and the former shareholders of NovaWave would not have agreed to structure the Merger Agreement with significant consideration in the form of Earn-Outs.

## FOURTH CAUSE OF ACTION

### (Unfair Competition – Cal. Bus. & Prof. Code § 17200)

92.     Scherer realleges and incorporates by reference each and every allegation
contained in the above paragraphs as if set forth fully herein.

93.     By engaging in the above-described acts and practices, Thermo Fisher has
committed one or more acts of unfair competition within the meaning of California Business and
Professions Code section 17200 *et seq.*

94.     Thermo Fisher's acts and practices of unfair competition were wrongful, arbitrary,
without reasonable business or commercial justification, oppressive, and have caused substantial
harm and injury to Scherer and NovaWave's former shareholders.

95.     Thermo Fisher's acts and practices described herein, and each of them, are unfair
because they offend established public policy, are immoral, oppressive, unscrupulous, and/or
substantially injurious to Scherer and NovaWave's former shareholders.  The harm to Scherer
and NovaWave's former shareholders outweighs the utility, if any, of Thermo Fisher's acts
and/or practices as alleged herein.

96.     Thermo Fisher's acts and practices described herein, and each of them, are
fraudulent because Thermo Fisher made false representations with the intent to induce Scherer
and NovaWave's former shareholders to enter into the Merger Agreement.  Scherer and
NovaWave's former shareholders relied upon Thermo Fisher's false representations, including
the reasonableness of the provisions governing the Earn-Outs, its intent to conduct its business
with "commercially reasonable efforts," and its intent to increase the number of employees.  If
Thermo Fisher had not made these false representations, Scherer and NovaWave's former
shareholders would not have entered into the Merger Agreement.

97.     Scherer and NovaWave's former shareholders have been injured by Thermo Fisher's unfair competition because they have not received payment for the Earn-Outs in an amount of at least $4 million.

98.     Scherer and NovaWave's former shareholders have thus suffered injury in fact through their loss of money, property, and value as a result of Thermo Fisher's unfair competition.

99.     At all times relevant hereto, Scherer is and was a resident and citizen of California.  As such, Thermo Fisher's unfair competition, including its unfair, unlawful and fraudulent business actions and practices, occur, originate, and emanate from California.

100.    Scherer is entitled to relief, including full restitution and/or disgorgement of all revenues, earning, profits, compensation, and benefits which may have been obtained by Thermo Fisher as a result of such business acts or practices, and enjoining Thermo Fisher from engaging in the acts and practices described herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.      Pursuant to California Business and Professions Code section 17203, that Thermo Fisher, its employees, agents, representatives, successors, assigns, and all persons who act in concert with Thermo Fisher be permanently enjoined from committing any further acts of unfair competition, including the violations alleged in the Fourth Cause of Action.

B.      Awarding Plaintiff compensatory damages in an amount to be determined at trial, but not less than (i) $4,000,000, together with interest thereon, arising out of Thermo Fisher's failure to honor its obligations to pay the Revenue-Based Earn-Outs to Scherer for distribution to NovaWave's former shareholders; and, (ii) monetary damages, in an amount to be determined at

trial, together with interest thereon, arising out of Thermo Fisher's failure to honor its obligations to pay the Milestone Earn-Outs to Scherer for distribution to NovaWave's former shareholders;

C.      Restitution in an amount to be determined at trial, but not less than (i) $4,000,000, together with interest thereon, arising out of Thermo Fisher's failure to honor its obligations to pay the Revenue-Based Earn-Outs to Scherer for distribution to NovaWave's former shareholders; and, (ii) monetary damages, in an amount to be determined at trial, together with interest thereon, arising out of Thermo Fisher's failure to honor its obligations to pay the Milestone Earn-Outs to Scherer for distribution to NovaWave's former shareholders;

D.      Awarding Plaintiff punitive damages in an amount to be determined at trial based on Thermo Fisher's outrageous conduct, evil motive, ill will, malice, wantonness, oppression, and reckless indifference to the rights of Scherer and other former shareholders of NovaWave;

E.      Attorneys' fees, costs, and disbursements; and,

F.      Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Scherer hereby demands a trial by jury in this action.

ASHBY & GEDDES, P.A.

Stephen E. Jenkins (I.D. No. 2152)
Toni-Ann Platia (I.D. No. 5051)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
302-654-1888 (Telephone)
302-654-2067 (Fax)
sjenkins@ashby-geddes.com
tplatia@ashby-geddes.com

*Counsel for Plaintiff James Scherer, in his capacity as Shareholders Representative*

*Of Counsel*:

Thad A. Davis
Kyle A. Withers
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921

Dated:  July 3, 2013